UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE,<br>Petitioner,<br>v.<br>FERETI SEMAIA, et al.,<br>Respondents. | Case No. 5:26-cv-04498-KES<br><br>ORDER GRANTING THE PETITION AND ORDERING PETITIONER'S RELEASE FROM CUSTODY |

## I. INTRODUCTION

John Doe[1] ("Petitioner") filed a counselled, verified petition for writ of habeas corpus under 28 U.S.C. § 2241 ("Petition" at Dkt. 1) challenging his detention by the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"). The parties have consented to the jurisdiction of the Magistrate Judge. (Dkt. 15.)

The Petition is granted, in part, and Respondents are directed to immediately release Petitioner from custody. Petitioner is entitled to release from custody on Ground 1, because his detention is not authorized under 8 U.S.C. § 1225(b)(2)(A).

[1] The Court authorized Petitioner to proceed under a pseudonym. (Dkt. 10.)

He is also entitled to both release from custody and prospective injunctive relief on Ground 3-A, because he was entitled to a pre-deprivation hearing as a matter of due process.

## II. PROCEDURAL HISTORY

Petitioner filed the present Petition on August 10, 2026. (Dkt. 1.) He also separately filed exhibits under seal. (Dkt. 12.) These exhibits include Petitioner's own sworn declaration. ("Pet'r Decl." at Dkt. 12-2.) The Petition raises the following claims:

Ground 1: Petitioner's detention is unlawful/ultra vires because he does not qualify for detention under 8 U.S.C. § 1225(b)(2)(A), the legal basis under which DHS detained him. (Pet. at 12-26.)

Ground 2: Petitioner's detention violates the Trafficking Victims Protection and Reauthorization Act ("TVPRA") because he arrived in the United States as an Unaccompanied Alien Child ("UAC"). (Id. at 16-30.) According to Petitioner, even after he turned 18, the TVPRA requires DHS "to consider the 'least restrictive placement' necessary to prevent danger or risk of flight, including alternative to detention programs," but the immigration judge ("IJ") did not do so. (Id., 4, ¶ 6, citing 8 U.S.C. § 1232(c)(2)(B).)

Ground 3-A: Petitioner's detention violates procedural due process because he did not receive a pre-detention bond hearing. (Id. at 30-35, ¶¶ 64-71.)

Ground 3-B: The one, post-detention bond hearing Petitioner received was inadequate to satisfy due process because, among other reasons, "DHS introduced [incomplete[2]] evidence of his juvenile adjudication to argue he is a danger," and

[2] The evidence presented to the IJ about Petitioner's juvenile adjudication included (1) Petitioner's FBI RAP sheet (Dkt. 21-5); (2) two news articles about the incident (Dkt. 21-1 at 53-72 (LA Times articles that do not mention Petitioner by name)); (3) the Second Superseding Indictment naming more than 20 co-conspirators but not Petitioner (Dkt. 21-1 at 81-82); and (4) a [redacted] 2025

the IJ relied on that evidence. (Id. at 43, ¶ 83.)

Ground 3-C: Petitioner's post-detention bond hearing was unlawful because the IJ's reliance on evidence about his juvenile adjudication violated his "federal right to informational privacy." (Id., at 43-49, ¶¶ 82-89.)

Ground 3-D: The Court should "conduct Petitioner's pre-deprivation hearing in the first instance," because the "Executive Office of Immigration Review ["EOIR"] is not currently a neutral adjudicator." (Id. at 36-37, ¶¶ 74-75.)

As a remedy, Petitioner seeks (1) immediate release and (2) an order enjoining Respondents from re-detaining him without a pre-detention bond hearing conducted by the district court that applies the TVPRA and excludes consideration of his juvenile adjudication. (Id. at 35-54.)

On August 17, 2026, Respondents answered the Petition. ("Answer" at Dkt 13.) Petitioner replied. ("Reply" at Dkt. 16.)

On August 24, 2026, Respondents lodged an audio recording of the March 19, 2026 bond hearing. (Dkt. 18.)

At the Court's invitation, on September 18, 2026, Petitioner filed a supplemental brief. ("Pet'r Suppl. Br." at Dkt. 25.) Respondents filed a response. ("Resp'ts Suppl. Br." at Dkt. 28.)

## III. FACTUAL RECORD

### A. Petitioner's Entry into the U.S., Grant of Asylum, and Dismissal of Removal Proceedings (Feb. 2015-Aug. 2016).

Petitioner is a twenty-five-year-old citizen of El Salvador. (Pet., ¶ 1.) He entered the United States on February 2, 2015, as a minor. (Id.; Answer Ex. A / Dkt. 13-1 (declaration of Deportation Officer Rogelio Torres, ¶ 5).)

Upon his arrival, along with his adult sister, he presented himself at a port of entry and applied for admission. (Pet., ¶ 52; Answer Ex. A / Dkt. 13-1, ¶ 5).)

---

interview with Petitioner (Dkt. 21-1 at 171-74).

Border Patrol agents took Petitioner into DHS custody. (Answer Ex. A / Dkt. 13-1, ¶ 5.) He was transferred to the custody of the Office of Refugee Resettlement ("ORR") and "released to his mother," who was already living in the United States, around February 19, 2015. (Pet., ¶ 2; Pet. Ex. B / Dkt. 12-3.) His mother entered into a Sponsor Care Agreement. (Pet. Ex. B / Dkt. 12-3.)

At some later point, removal proceedings were initiated against Petitioner, and he applied for asylum. (Pet., ¶¶ 2, 20.) On July 27, 2016, he was granted asylum. (Pet., ¶¶ 2, 21; Pet. Ex. C / Dkt. 12-4 (asylum approval).) On August 11, 2016, his removal proceedings were terminated. (Pet., ¶¶ 2, 21; Pet. Ex. D / Dkt. 12-5 (termination order).)

### B. <u>Juvenile Arrest for Battery (2016) and Juvenile Adjudication for Murder ([redacted] 2018-Mar. 2023).</u>

On December 9, 2016, Petitioner was arrested on suspicion of misdemeanor battery. (Answer Ex. E / Dkt. 13-5 at 4 (Record of Arrest and Prosecution ("RAP") sheet).) He was released to a "parent/guardian," presumably his mother. (<u>Id.</u>)

On [redacted] 2018, Petitioner was arrested on suspicion of murder under California Penal Code section 187(a). (Answer Ex. E / Dkt. 13-5 at 5 (Petitioner's RAP sheet).) He was transported to juvenile hall. (<u>Id.</u>)

There was an adverse juvenile adjudication on [redacted], 2021.[3] (Pet.,

---

[3] A juvenile adjudication is a formal decision in the juvenile justice system stating that a minor committed a delinquent or status offense such that they are adjudged a ward of the court. <u>See</u> California Welfare and Institutions Code § 602(a). In such proceedings, the "juvenile has the right to notice of the charges against him or her, the right to counsel, the privilege against self-incrimination, the right to confrontation and cross-examination, the protection against double jeopardy, and the allegation must be proved beyond a reasonable doubt." <u>People v. Lee</u>, 111 Cal. App. 4th 1310, 1316 (2003). "An order adjudging a minor to be a ward of the juvenile court shall not be deemed a conviction of a crime for any purpose, nor shall a proceeding in the juvenile court be deemed a criminal

¶ 3; Answer Ex. D / Dkt. 13-4 at 4 (DHS Form I-213).) The adjudication included allegations that the perpetrators of the homicide had gang-related motives. (Pet., ¶ 24.) Petitioner maintains his innocence and denies ever having been a gang member. (Pet'r Decl., ¶ 4.) He was sentenced on [redacted] 2022. (Answer Ex. E / Dkt. 21-5 at 5.) He was discharged from California Youth Authority ("CYA") custody on [redacted] 2023. (Id.) Petitioner also completed a term of probation. (Pet., ¶ 22.)

Sometime later, he started working for [redacted] an organization that helps people in the juvenile justice system with their re-entry. (Id., ¶¶ 3, 22.) He also became a father; his son is a U.S. citizen. (Pet'r Decl., ¶¶ 2, 11.)

### C. Current Detention by ICE ([redacted] 2025).

On [redacted] 2025, Petitioner was detained by ICE. Federal agents were in [redacted], California, looking for a someone living on [redacted] Street who they believed to be an MS-13 gang member who was residing in the United States illegally. (Answer Ex. A / Dkt. 13-1, ¶ 6; Answer Ex. D / Dkt. 13-4 at 3; Dkt. 21 at 172.)

Petitioner was in the area picking up clients as part of his work. (Pet'r Decl., ¶ 20.) Apparently, Petitioner's client was the man being targeted by ICE, and ICE agents observed Petitioner pick up their target at the [redacted] Street address in Petitioner's car. (Dkt. 21-1 at 172 (DHS Report of Investigation).)

After the pickup at about 8:30 a.m., agents initiated a traffic stop of Petitioner's black [redacted] "near the intersection of [redacted] Street and [redacted] Avenue." (Answer Ex. D / Dkt. 13-4 at 3.) Petitioner, the driver, first saw "a black SUV in the middle of the road with tinted windows and no markings" and without "its lights on." (Pet'r Decl., ¶ 20.) He started to back up "because [he] thought [the SUV] was going to pass," but he did not check his rearview

---

proceeding." In re Gabriel T., 3 Cal.App.5th 952, 961 (2016).

mirror. (Id.) Petitioner then "accidentally backed up into the government vehicle behind him."[4] (Pet., ¶ 3.) This prompted the agents, who were wearing ski masks, to exit their vehicles, point their weapons at Petitioner, and shout, "Police, freeze!" at which point Petitioner "fled on foot." (Id.; Answer Ex. D / Dkt. 13-4 at 3;Pet'r Decl., ¶ 21.) He jumped a fence, ran to a nearby gas station, and paid a man there to drive him home, leaving his passport, phone, and keys in his car. (Pet'r Decl., ¶ 23; Answer Ex. D / Dkt. 13-4 at 3.)

Petitioner called his own phone and learned that one of his clients had taken his phone and keys, but "officers took [his] passport." (Pet'r Decl., ¶ 24.) Two friends later picked Petitioner up at home in a [redacted] and they drove back to [redacted] to retrieve Petitioner's property from his client. (Pet'r Decl., ¶ 25.)

At about 10:15 a.m., agents saw the [redacted] do a "rolling stop" by the [redacted], Petitioner's car, and then drive away toward the target address on [redacted] Street. (Pet. Ex. D / Dkt. 13-4.) According to the agents, the Camaro came back, passed by the [redacted] again, and then drove toward [redacted] Street. (Id.) When agents pursued, the [redacted] accelerated "at an excessively high rate of speed" to evade the agents. (Id.) The agents terminated the pursuit after losing sight of the [redacted] (Id.)

Petitioner's declaration does not describe any car pursuit. He declares that he and his friends "went back to the [[redacted]]" but observed that "the tires had been dropped, which means someone had poked a knife in the tires," at which point Petitioner and his friends decided to go to a seafood restaurant. (Pet'r Decl., ¶ 25.)

At about 10:30 a.m., agents spotted the [redacted] driving and followed it until it parked in a commercial area. (Pet. Ex. D / Dkt. 13-4.) According to Petitioner,

[4] In his declaration, he says, "A car then hit my car from behind. I never saw the car behind me before it hit me." (Pet'r Decl., ¶ 20.) At his later interview with law enforcement, according to the officers' interview notes, Petitioner said that he "panicked" and put his car in reverse. (Dkt. 21-1 at 172.)

he and his friends had parked in front of a seafood restaurant. (Pet'r Decl., ¶ 26.) Petitioner called his probation officer from the car asking for help, but the probation officer told him that he was wanted for assaulting a federal officer and the matter was "out of his control." (Id.)

After spending "a minute or two" parked, Petitioner saw a black car pull up behind the [redacted]. (Id., ¶ 27.) Masked men got out and drew their guns. (Id.) One of Petitioner's friends called the local police. (Id.) The agents instructed the [redacted]'s occupants to roll down the windows, turn off the engine, and exit the vehicle, but, according to the agents, the front passenger "yelled and screamed at the officers … questioning their identities and refusing to comply with their commands." (Answer Ex. D / Dkt. 13-4 at 3; compare with Pet'r Decl., ¶ 27 ("[redacted] talked to the officers and asked the officers to identify themselves.").) Eventually, the agents smashed a window and removed the [redacted]'s occupants at gunpoint. (Answer Ex. D / Dkt. 13-4 at 4;Pet'r Decl., ¶¶ 28-29; Pet., ¶ 23.)

Petitioner was booked into the federal Metropolitan Detention Center ("MDC"). (Answer Ex. D / Dkt. 13-4 at 4.) He was charged with violating 18 U.S.C. § 111, assaulting or resisting a federal officer. (Answer Ex. E / Dkt. 13-5 at 2.) However, the U.S. Attorney's Office ultimately declined to prosecute the assault charge. (Answer Ex. A / Dkt. 13-1, ¶ 9.)

**D. Interview with ICE Agents and Transfer to ICE Custody ([redacted] 2025).**

Around 2:00 p.m. on the date of his arrest, [redacted] 2025, two officers from Homeland Security Investigations interviewed Petitioner. (Pet'r Decl., ¶ 30; Answer Ex. E / Dkt. 21-1 at 172-73.) According to Petitioner, they read him his rights and questioned him about his juvenile record, his tattoos, and "a fight in high school." (Pet'r Decl., ¶ 30.) According to a report the officers drafted about the incident, Petitioner stated in relevant part as follows:

> [A]fter he moved to the U.S., he had his mind set about joining

the gang because he did not grow up with a father and was raised only by his mother and grandfather. Additionally, he was surrounded by gangs growing up.

[Petitioner] said [that a] 2016 battery arrest violation … from a fight at school resulted in him being documented as a gang member. … [Petitioner] stated because he was an immigrant from El Salvador, and he just hung out with "those guys" and "they thought I did something[,]" he was identified as a[n] MS-13 gang member.

[Petitioner] was indicted for murder along with other MS-13 gang members. [Petitioner] admitted to being identified as a[n] MS-13 gang member by the courts but denied this claim and alleged false testimony about his MS-13 association were [sic] used in court.

… [Petitioner] explained the three (3) dots tattooed on his left elbow represented the time when he "was running with the people down south." (**AGENT'S NOTE: The reference to "was running with the people down south" is understood as an allegiance or association with Sureno gangs.) [Petitioner] stated he knows that people up north "run" with the people up north and the people down south "run" with the people down south.

(Answer Ex. E / Dkt. 21-1 at 173-74.)

On [redacted], 2025, Petitioner was transferred from MDC to ICE custody. (Pet'r Decl., ¶ 31; Answer Ex. A / Dkt. 13-1, ¶ 9.)

**E. <u>Immigration Court Proceedings to Terminate Petitioner's Asylee Status and Remove Him (Sept.-Oct. 2025).</u>**

On September 13, 2025, Petitioner was served with a Notice to Appear ("NTA") initiating removal proceedings. (Pet. Ex. I / Dkt. 12-10 (the NTA).) Notably, the NTA did not classify Petitioner as an "arriving alien" but rather as "an alien present in the United States who has not been admitted or paroled," and it

alleged that Petitioner was removable under Immigration and Nationality Act ("INA") § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), i.e., because "at the time of application for admission," he was "not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document…." (Id. at 1, 4.) The NTA noted, "On September 12, 2025, USCIS has issued a Notice of Intent to Terminate Asylum Status ["NOIT"] advising you of the reasons for seeking to terminate your asylee status." (Id. at 4.)

The NOIT's stated reason for seeking termination was Petitioner's membership in the MS-13 gang, which the NOIT stated was "a Tier I Designated Terrorist Organization." (Pet. Ex. J / Dkt. 12-11 at 2 (IJ's bond memo).) USCIS contended that Petitioner "admitted, 'during a Mirandized interview,[5] to documented membership" in MS-13. (Id.)

On October 2, 2026, USCIS issued a second NOIT contending that Petitioner not only "admitted to being an MS gang member which is a Tier I Designated Terrorist Organization," but also that "he provided material support to a Tier III terrorist organization when he participated in a murder along with other MS-13 gang members; that his membership in MS-13 is a fundamental change of circumstances because his fear of harm in El Salvador was based on harm by MS-13; and that country conditions information from El Salvador indicate a fundamental change in circumstances." (Id.)

On October 29, 2025, DHS filed a motion to terminate Petitioner's asylee status. (Id.) The IJ "found that a change of country conditions warrants termination of [Petitioner's] asylee status, but that a hearing [would] need to be conducted to determine whether [Petitioner's] asylee status should be terminated in the exercise of the Court's discretion." (Id.)

---

[5] This appears to be referring to the interview with the Homeland Security Investigations Officers at MDC on [redacted] 2025.

### F. IJ's Finding that Petitioner Was Ineligible for Bond as an Applicant for Admission (Jan. 8, 2026).

On December 31, 2025, Petitioner, through counsel, filed a motion requesting a Joseph bond hearing, arguing that he is not subject to mandatory detention under INA § 236(c), 8 U.S.C. § 1226(c), because DHS is "substantially unlikely to prevail on either terrorism inadmissibility grounds (INA §§ 212(a)(3)(B)(i)(V) and (VI), as codified at 8 U.S.C. § 182(a)(3)(B)(i)(V), (VI)) as a basis to terminate his asylee status." (Pet. Ex. J / Dkt. 12-11 at 2.) Noncitizens detained under § 1226(c) may request a "Joseph hearing" to challenge their mandatory detention, such as by arguing that a prior conviction is not for a qualifying crime. See Matter of Joseph, 22 I. & N. Dec. 799 (BIA 1999). Counsel requested a Joseph hearing because he believed DHS would argue that Petitioner was subject to mandatory detention under § 1226(c) – but no one ever notified counsel of the statutory basis for Petitioner's detention. (Pet'r Suppl. Br. at 13.)[6]

On January 7, 2026, DHS filed a Form I-261, Additional Charges of Inadmissibility/Deportability, in which it "amended [Petitioner's] status to that of an arriving alien." (Pet. Ex. J / Dkt. 12-11 at 2 (IJ's bond memo, summarizing procedural history).)

---

[6] Petitioner's counsel appears to have assumed that DHS was detaining Petitioner under 8 U.S.C. § 1226(c)(1)(D), which provides that detention is mandatory if the noncitizen "is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title." Sections 1182(a)(3)(B) and 1227(a)(4)(B) make noncitizens inadmissible or deportable based on "terrorist activities." Respondents' briefing in this case does not assert that Petitioner is subject to mandatory detention under § 1226(c). (Cf. Resp'ts Suppl Br. at 6 ("[T]he Petition should be denied or dismissed, except to order that Petitioner receive an 8 U.S.C. § 1226(a) bond hearing. … Petitioner's request for a Joseph bond hearing—in and of itself—does not render him a mandatory detainee under 8 U.S.C. § 1226(c)."); id. at 8 ("[T]he IJ did not reach the question of whether Petitioner is a mandatory detainee under 8 U.S.C. § 1226(c) during his Joseph bond hearing.").)

A hearing was held before the IJ the next day, on January 8, 2026. (Answer Ex. B / Dkt. 13-2 (IJ order issued Jan. 8, 2026); Pet. Ex. J / Dkt. 12-11 (IJ bond memo issued on Feb. 17, 2026).) Rather than deciding whether Petitioner was subject to mandatory detention under § 1226(c), the IJ determined that he had "no jurisdiction" to conduct a bond hearing because Petitioner was "an arriving alien and an applicant for admission." (Id. at 2.)

The IJ reasoned, "An alien present in the United States who has not been admitted or who arrived in the United States whether or not at a port of entry is an applicant for admission. … A subsequent grant of asylum does not change the historical fact that [Petitioner] lacked valid entry documents when he sought admission at the San Ysidro port of entry." (Id. at 3.) Citing case law, the IJ reasoned, "[E]ven though [Petitioner] was afforded asylee status, he was not legally admitted to the United States as a result." (Id. at 3-4.) Since this status made Petitioner subject to mandatory detention under § 1225(b)(2)(A), the IJ concluded that he lacked jurisdiction to consider bond.[7] (Id.)

Petitioner appealed, but the Board of Immigration Appeals ("BIA") denied the appeal as untimely. (Pet. Ex. K / Dkt. 12-12.)

**G. Six-Month *Rodriguez* Bond Hearing (March 19, 2026).**

On March 19, 2026, after Petitioner had been in custody for about six months, an IJ conducted a Rodriguez[8] bond hearing.

---

[7] The IJ's decision refers to "INA § 235(b)(2)(A)" which is the codified at 8 U.S.C. § 1225(b)(2)(A).

[8] "Named after the Ninth Circuit's decision in Rodriguez v. Robbins, 804 F.3d 1060 (9th Cir. 2015), which has an extensive history that need not be recounted here, a Rodriguez bond hearing is a periodic custody redetermination proceeding … where the government must show at six-month intervals that a detainee's continued detention pending removal proceedings is justified by clear and convincing evidence of flight risk or danger to the community." Penaloza Monsalve v. Semaia, No. 26-cv-00463-SVW-ACCV, 2026 WL 1625352, at *1 n.1

This Court has reviewed the audio recording of the bond hearing. (See Dkt. 18 (Respondents' notice of lodging the audio of the bond hearing).) The IJ first confirmed the exhibits with counsel. (See Answer Ex. E / Dkt. 21-1 at 5-176, Dkt. 21-2 (the parties' exhibits).) The IJ noted that Petitioner had filed a "motion to suppress" which sought to suppress evidence related to Petitioner's juvenile adjudication. (Answer Ex. E / Dkt. 21-1 at 2 (Petitioner's motion in limine).) The IJ denied that motion.

DHS argued that Petitioner was both a danger and a flight risk based on his "criminal conduct" and the circumstances of his ICE arrest. In response, Petitioner's counsel submitted a written statement to the IJ and read portions of it. Counsel argued that DHS could not meet its burden of proving dangerousness by clear and convincing evidence based on an old juvenile adjudication without individualized consideration of the significant evidence of Petitioner's rehabilitation. Counsel also argued that Petitioner's decision to flee from ICE did not prove dangerousness because (1) he was reasonably frightened when armed, masked men in unmarked vehicles boxed in his car; (2) he had no reason to think that the men were legitimate ICE agents, since ICE had no reason to target him, a person with lawful asylee status in the U.S., and he did not know that his client was an ICE target; and (3) the U.S. Attorney's Office chose not to prosecute the assault charges stemming from his backing into the agents' vehicle.

The IJ ultimately found that DHS "met its burden to establish that Respondent is a danger to the community." (Answer Ex. C / Dkt. 13-3; Pet. Ex. L / Dkt. 12-13.) The IJ made no finding as to flight risk. (Id.) Petitioner did not appeal this ruling to the BIA. (Dkt. 25 at 39.)

Petitioner is next scheduled for a WebEx "individual hearing" on October 26, 2026. EOIR Automated Case Information, https://acis.eoir.justice.gov/en/ (A#

---

2026 U.S. Dist. LEXIS 121961, at *2 n.1 (C.D. Cal. June 1, 2026).

[redacted] (El Salvador), last accessed Oct. 7, 2026)); (see also Pet'r Suppl. Br. at 42). He remains in ICE custody. ICE Online Detainee Locator System, https://locator.ice.gov/odls/#/search (A# [redacted] (El Salvador), last accessed Oct. 7, 2026)). He has now been in ICE custody for more than a year.

## IV. DISCUSSION

### A. Petitioner is Entitled to Relief on Ground 1 Because He is Not Subject to Detention Under § 1225(b)(2)(A).

#### 1. Summary of the Claim.

Petitioner contends that ICE cannot lawfully detain him under 8 U.S.C. § 1225(b)(2)(A) because he is not presently (and was not on [redacted], 2025, when he was taken into ICE custody) an "applicant for admission who is seeking admission nor an arriving alien." (Pet., ¶ 44.) He argues that this provision "does not apply to those who previously entered the country, were released from detention after a finding was made that they were not a flight risk or a danger[,] and have been present and residing in the United States prior to re-apprehension." (Id., ¶43.) "Such individuals," he argues, "may only be detained pursuant to section 1226(a), unless one of the other mandatory detention provisions applies." (Id.) According to Petitioner, by detaining him under an inapplicable statute, DHS committed an ultra vires act outside its authority, which renders his detention unlawful and entitles him to release. (Id., ¶¶ 9, 31, 52-53.)

Respondents' Answer asserted that Petitioner's "arrest[] for murder … constitutes changed circumstances allowing Respondents to detain him." (Answer at 2-3.) The Answer did not specify which statutory provision—§§ 1226(a), 1226(c), or 1225(b)(2)(A)—Respondents contended authorizes his detention. In their supplemental brief, they double down on the argument that Petitioner has always been an "applicant for admission" subject to mandatory detention ever since he presented himself at the border – notwithstanding his initial release to his mother and later grant of asylum. (Resp'ts Suppl. Br. at 7-8 ("Petitioner has been

properly classified as an arriving alien since he arrived in the United States in 2015….").)

**2. Legal Standard.**

a. Section 1226(a).

This section provides, "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). It therefore "authorizes the federal government to detain aliens pending the completion of their removal proceedings." Rodriguez Diaz v. Garland, 53 F.4th 1189, 1193 (9th Cir. 2022). Detention is not mandatory; the government may either detain the noncitizen or release them on bond or conditional parole. Id. at 1196 (citing 8 U.S.C. § 1226(a)(1)-(2)).

Section 1226(a) and its implementing regulations "provide extensive procedural protections that are unavailable under other detention provisions, including several layers of review of the agency's initial custody determination, an initial bond hearing before a neutral decisionmaker, the opportunity to be represented by counsel and to present evidence, the right to appeal, and the right to seek a new hearing when circumstances materially change." Id. at 1202.

b. Section 1225(b)(2).

Under § 1225(a)(1), "an alien who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.'" Jennings v. Rodriguez, 583 U.S. 281, 287 (2018). "[A]pplicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." Jennings, 583 U.S. at 287.

Section 1225(b)(1) "applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation," or "certain other aliens designated by the Attorney General in his discretion." Id. (citing 8 U.S.C. § 1225(b)(1)(A)(i), (iii)). Section 1225(b)(2) "is broader" and "serves as a catchall

provision that applies to all applicants for admission not covered by § 1225(b)(1)." Id.

Aliens who fall under § 1225(b)(2) are subject to mandatory detention if they also fall under § 1225(b)(2)(A), which reads as follows:

> Subject to [certain exceptions not applicable here], in the case of an alien who is an *applicant for admission*, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under section 1229a of this title [i.e., removal proceedings].

8 U.S.C. § 1225(b)(2)(A) (emphasis added).

Thus, while "noncitizens detained under § 1226(a) are entitled to receive bond hearings at the outset of detention," applicants for admission who fall under § 1225(b)(2)(A) "are subject to mandatory detention for proceedings under 8 U.S.C. § 1229(a) and not entitled to the due process protections found within § 1226(a)." Maldonado Bautista v. Santacruz, 813 F. Supp. 3d 1084, 1102 (C.D. Cal. 2025).

c. The Ninth Circuit's interpretation of § 1225(b)(2)(A).

In July 2025, DHS issued a new policy that "require[d] ICE employees to consider anyone arrested in the United States and charged with being inadmissible as an 'applicant for admission' under 8 U.S.C. § 1225(b)(2)(A)." Maldonado Bautista, 813 F. Supp. 3d at 1094.

In July 2026, the Ninth Circuit considered a challenge to this policy and rejected it, holding that "aliens present without admission who are apprehended in the interior of the United States are subject to the detention regime of § 1226, not § 1225(b)(2)(A)." Rodriguez Vazquez v. Bostock, 183 F.4th 1160, 1165 (9th Cir. 2026) ("Bostock"). After considering the relevant statutory language and legislative history, the Ninth Circuit concluded that § 1225(b)(2)(A) "is best

construed as applying to aliens *entering* the United States at the border," whereas § 1226(a) "is best understood as governing inadmissible and deportable aliens *present* in the interior of the United States." Id. at 1172 (emphasis added). The Ninth Circuit reasoned that this interpretation: (a) gives "effect to the phrase 'seeking admission,'" which otherwise would be superfluous; (b) is consistent with "the ordinary understanding of the present participle 'seeking,' which normally would be used to describe someone actively doing something"; and (c) "coheres with the statute's reference to an 'examining immigration officer,'" which "more naturally describes a formal examination, something that traditionally occurs at the nation's borders." Id. at 1174-76. The Ninth Circuit reasoned, "[A]n alien should not be regarded as being in a perpetual state of 'seeking admission' or 'applying' for it, for purposes of other statutory provisions, just because he is deemed an 'applicant for admission' in § 1225(a)(1)." Id. at 1177; see also Da Cunha v. Freden, 175 F.4th 61, 77 (2d Cir. 2026) ("When the statute says, 'alien seeking admission,' it therefore refers to a noncitizen who is seeking admission *right now*, not one who sought admission in the past but no longer is.").[9]

**3. Analysis.**

a. Petitioner is not subject to detention under § 1225(b)(2)(A).

As discussed above, the IJ reasoned that Petitioner was properly detained under § 1225(b)(2)(A) because a "subsequent grant of asylum does not change the historical fact that [Petitioner] lacked valid entry documents when he sought admission at the San Ysidro port of entry" in February 2015. (Pet. Ex. J / Dkt. 12-11 at 3.) This interpretation of § 1225(b)(2)(A) is inconsistent with the Ninth

---

[9] There is currently a circuit split regarding how to interpret § 1225(b)(2)(A), and the Supreme Court has granted certiorari to consider it. See Rhoney v. Barbosa da Cunha, No. 26-104, --- S.Ct. ----, 2026 WL 2942994 (U.S. Oct. 1, 2026).

Circuit's reasoning in Bostock. Even assuming the IJ is correct that being granted asylum is not equivalent to being "admitted," ICE encountered Petitioner inside the United States and detained him after years of lawful residence in the United States. Petitioner therefore is not currently "seeking admission" to the United States. See Bostock, 183 F.4th at 1172 (reasoning that that § 1225(b)(2)(A) "is best construed as applying to aliens *entering* the United States at the border," whereas § 1226(a) "is best understood as governing inadmissible and deportable aliens *present* in the interior of the United States.") (emphasis added); see also Similien v. Warden, Fed. Det. Ctr., No. 26-cv-21739, 2026 U.S. Dist. LEXIS 72610, at *4-9, 2026 WL 900078, at *4-5 (S.D. Fla. Apr. 2, 2026) (rejecting government's argument that "because USCIS terminated [the petitioner's] asylum status," he was "an applicant for admission subject to mandatory detention under § 1225(b)(2)(A)"; reasoning that "foreign nationals who, like Petitioner, are already in the United States" are "governed by § 1226(a)").[10]

For all these reasons, the Court finds that Petitioner cannot be lawfully detained under § 1225(b)(2)(A).

b. The Court declines to consider whether Petitioner could, theoretically, be properly detained under § 1226(a).

Respondents argue that, in the alternative, Petitioner's 2018 arrest and juvenile adjudication for murder constituted a "changed circumstance" that allowed ICE to detain Petition in 2025. (Answer at 2-3; Resp'ts Suppl Br. at 6.)

---

[10] Accepting Respondents' and the IJ's reasoning could potentially mean that noncitizens who have been granted asylum could be subject to mandatory detention under § 1225(b)(2)(A), even if their removal proceedings had been dismissed. The Court is extremely skeptical that detention of such persons could serve any proper purpose. See generally Zadvydas v. Davis, 533 U.S. 678, 690-92 (2001) (noting the two permissible non-punitive purposes for detention under the immigration laws are (1) ensuring a noncitizen's appearance at removal proceedings or removal and (2) preventing danger to the community).

They appear to be arguing that his detention was therefore proper under 8 U.S.C. § 1226(a). (See id. at 6 ("[T]he Petition should be denied or dismissed, except to order that Petitioner receive an 8 U.S.C. § 1226(a) bond hearing.").) Putting aside the question of whether a circumstance that has existed for nearly ten years is a "changed" circumstance, the fact remains that Respondents ***did not*** detain Petitioner under 8 U.S.C. § 1226(a). The IJ clearly determined that Petitioner was subject to mandatory detention under 8 U.S.C. § 1225(b), a determination that precluded the IJ from considering bond. (Answer Ex. B / Dkt. 13-2.) The Court declines to consider the legality of detention decisions that Respondents could have made but never actually made.

c. The appropriate remedy is release from custody, not a new bond hearing under § 1226(a).

Respondents argue, "[I]f the Court finds that Petitioner is detained under 8 U.S.C. § 1226(a), Respondents reiterate their assertion that Petitioner's appropriate remedy, if any, is a bond hearing rather than release." (Resp'ts Suppl. Br. at 9.) It is true that, if the government misclassifies a noncitizen as subject to mandatory detention under § 1225(b)(2)(A), the remedy generally is to order them reclassified as detained under § 1226(a), making them bond eligible.

Some courts have held, however, that where the government persistently misclassifies a noncitizen and only provides a bond hearing after months of detention, the proper remedy is release. See, e.g., De La Cruz-Soto v. Warden, Cal. City Det. Ctr., No. 26-cv-04344, 2026 U.S. Dist. LEXIS 144973, at *4, 2026 WL 1893571, at *2 (E.D. Cal. June 30, 2026) ("The court finds, considering respondent continuing to misclassify petitioner's detention, despite a binding order finding that petitioner was not subject to detention under 8 U.S.C. § 1225(b)(2), and there being no real bond hearing provided following notice of petitioner's request for months, the appropriate remedy is release."); Feng v. Lyons, No. 26-cv-00235, 2026 U.S. Dist. LEXIS 34295, at *3, 2026 WL 472635, at *1 (E.D. Cal.

Feb. 19, 2026) ("Provision of a bond hearing after months of detention without the opportunity to seek release on bond cannot be said to satisfy due process where that bond hearing is a matter of statutory right.").

Here, Petitioner entered ICE custody on [redacted] 2025, and did not get a bond hearing until March 19, 2026, at which point he had been in custody for more than six months, even though he was statutorily entitled to a bond hearing upon request under § 1226(a). To make matters worse, no one told Petitioner or his counsel the statutory basis for his detention until long after he was detained, forcing counsel to guess what kind of relief he should request. (Pet'r Suppl. Br. at 13.) While counsel was preparing to argue against mandatory detention under § 1226(c), "DHS chose to add the 'arriving alien' designation (triggering section 1225(b) mandatory detention) just prior to the Joseph hearing." (Id. at 14.) This was not done until January 7, 2026, nearly ***four months*** after Petitioner was taken into ICE custody and ***one day before*** the hearing. (Id.) The government cannot offer post hoc rationalizations for why immigration detention is lawful while refusing, for months, to disclose the actual statutory basis for said detention.

Under these circumstances, the Court finds that the appropriate remedy for the unlawful detention demonstrated by success on Ground 1 is Petitioner's release from detention. Petitioner is also entitled to release from custody based on Ground 3-A of the Petition, his due process claim, as discussed below.

### B. Petitioner Is Entitled to Relief on Ground 3-A Because He Was Entitled to a Pre-Deprivation Bond Hearing as a Matter of Due Process.

#### 1. General Due Process Standard.

The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law[.]" U.S. Const. Amend. V. The right to due process extends to "all 'persons' within the United States, including [non-citizens], whether their presence

here is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001).

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). "[T]he Due Process Clause of the Constitution may require greater procedural protections than a statutory or regulatory scheme provides when freedom from imprisonment is at stake." Perez Bueno v. Janecka, No. 25-cv-03376-CAS-BFM, 2026 WL 309934, at *3, 2026 U.S. Dist. LEXIS 24644, at *7 (C.D. Cal. Feb. 5, 2026). To determine what procedural protections an individual is owed in the event of a government deprivation of a protected liberty interest, courts balance three factors: (a) the private interest that will be affected by the official action; (b) the risk of an erroneous deprivation of such interest and the value of additional procedural safeguards; and (c) the countervailing government interest. Mathews, 424 U.S. at 335.

**2. Liberty Interest and Private Interest Affected.**

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." Zadvydas v. Davis, 533 U.S. 678, 690 (2001). "Even individuals who face significant constraints on their liberty or over whose liberty the government wields significant discretion retain a protected interest in their liberty." Pinchi v. Noem, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025).

Many district courts in this circuit have held that noncitizens previously released from custody have a protected liberty interest in remaining out of custody, because "the government's decision to release [them] creates an implicit promise, upon which that individual may rely, that their liberty will be revoked only if they fail to live up to the conditions of release." Ramos-Maldonado v. Semaia, No. 26-cv-01202-SSS-AS, 2026 WL 790788, at *2, 2026 U.S. Dist. LEXIS 57088, at *6-7

(C.D. Cal. Mar. 18, 2026); see also Domingo v. Kaiser, No. 25-cv-05893, 2025 WL 1940179, at *2, 2025 U.S. Dist. LEXIS 133824 at *5-6 (N.D. Cal. July 14, 2025) (collecting cases). Here, Petitioner's liberty interest is even stronger. He was not on conditional release when he encountered ICE. Rather, he had lawful asylee status in the U.S. Moreover, when he encountered ICE on [redacted] 2025, there were no changes in his personal circumstances that made him an ICE target. Rather, unbeknownst to him, he had offered a ride to an ICE target as part of his employment – a fact he had no reason to believe put his liberty in jeopardy. Petitioner also has a substantial private interest in remaining out of custody because that "would allow him to care for and continue to provide for his family…." Domingo, 2025 WL 1940179, at *3, 2025 U.S. Dist. LEXIS 133824, at *6. In ICE custody, he has been unable to work and care for his newborn baby. (Pet'r Decl. ¶¶ 2, 11-12.)

The Court has considered whether Petitioner's liberty interest was reduced because he was transferred from MDC to ICE custody. Petitioner has cited cases holding that a liberty interest sufficient to support a due process right to a pre-deprivation hearing still exists even when a noncitizen is released from state criminal custody. (Pet'r Suppl. Br. at 27-29); see, e.g., Kandola v. Warden, Cal. City Det. Fac., No. 26-cv-02714, 2026 U.S. Dist. LEXIS 100434, at *5, 2026 WL 1243464, at *2 (E.D. Cal. May 6, 2026), report and recommendation adopted, 2026 U.S. Dist. LEXIS 107939, 2026 WL 1363087 (E.D. Cal. May 15, 2026).

Given these well-reasoned cases, the shortness of Petitioner's stay at MDC, the fact that he was at MDC awaiting an initial appearance (and not because of a conviction), and the fact that the U.S. Attorney's Office ultimately chose not to pursue charges, Petitioner has demonstrated a strong liberty interest.

**3. Risk of Erroneous Deprivation and Value of Additional Procedural Safeguards.**

"[T]he risk of erroneous deprivation of liberty is high absent the procedural

safeguard of a pre-deprivation hearing before a neutral decisionmaker to determine whether Petitioner's detention bears a reasonable relation to the authorized statutory purposes of civil immigration detention: to ensure appearance at future immigration proceedings or to prevent danger to the community." Perez Bueno, 2026 WL 309934, at *4, 2026 U.S. Dist. LEXIS 24644, at *9 (citing Zadvydas, 533 U.S. at 693-94).

Here, Respondents argue that the procedures Petitioner received were sufficient to protect his liberty interest against the risk of erroneous deprivation. (Answer at 7.) They support this argument by claiming that "Petitioner received several opportunities for bond hearings since he has been in immigration detention." (Id.) This is not true. In January 2026, the IJ found that he lacked jurisdiction to conduct a bond hearing because Petitioner was subject to mandatory detention. (Answer Ex. B / Dkt. 13-2.) That proceeding does not count as a bond hearing, because there was no assessment of whether Petitioner was a danger to the community or a flight risk. Moreover, the IJ's "mandatory detention" finding precluded Petitioner from requesting another bond hearing. Petitioner did not receive even one bond hearing until after he had already been in detention for more than six months. This does not demonstrate adequate procedure to protect Petitioner's strong liberty interest.

A pre-deprivation hearing would require the government to produce its evidence of changed circumstances and give Petitioner an opportunity to challenge that evidence. Requiring the government to do so *before* Petitioner's arrest gives him a meaningful opportunity to retain counsel and collect evidence. This is a significant procedural safeguard. Without written notice and a meaningful, individualized bond hearing, "the risk of an erroneous deprivation of liberty is high because neither the government nor [Petitioner] … had an opportunity to determine whether there is any valid basis for [his] detention." Fernandez, 2026 U.S. Dist. LEXIS 10909, at *25, 2026 WL 136229, at *5.

The circumstances of this case demonstrate the additional value of a pre-deprivation hearing. As discussed above, Petitioner was not told which INA provision the government was relying on to justify his detention (§ 1225(b)(2)(A)) until the day before the January 2026 IJ hearing. This lack of meaningful notice led his counsel to prepare arguments and collect evidence related to a completely different detention provision (§ 1226(c)). A pre-deprivation hearing would also have allowed the parties to determine whether Petitioner is currently a UAC entitled to certain procedural protections under the TVPRA, an issue they still dispute.

**4. Countervailing Government Interest.**

As many other courts have recognized, there is no meaningful countervailing government interest that supports detaining previously released noncitizens like Petitioner without a pre-detention hearing. Ramos-Maldonado, 2026 WL 790788, at *4, 2026 U.S. Dist. LEXIS 57088, at *11 (collecting cases); Gudavasov v. Marin, No. No. 26-cv-00541-AH-MBK, 2026 WL 712827, at *2, 2026 U.S. Dist. LEXIS 49484, at *6 (C.D. Cal. Mar. 9, 2026) (same). Respondents argue that "the government clearly has a strong interest in preventing aliens from remaining in the United States in violation of our law." (Answer at 8.) But Petitioner had been granted asylum; in [redacted] 2025, he was not in the U.S. "in violation of our law." Indeed, the immigration court has not yet decided whether Petitioner's asylee status should be revoked. (See Pet. Ex. J / Dkt. 12-11 at 2 (IJ's bond memo, noting that to rule on DHS's motion to terminate Petitioner' asylee status, "a hearing will need to be conducted to determine whether [Petitioner's] asylee status should be terminated in the exercise of the [IJ's] discretion").) Presumably, this issue will be decided at the upcoming individual hearing currently set for October 26, 2026.

Additionally, the burden of a pre-detention hearing is low. In immigration court, custody hearings are routine and impose a minimal cost. In this Court's

experience, Respondents are routinely able to comply with orders requiring that such a hearing be held within seven days. Respondents argue that even if due process requires a pre-deprivation hearing, they should be excused from providing one because, lacking a "regulatory delegation" from the Attorney General, IJs lack legal authority to conduct a pre-deprivation hearing. (Answer at 8-9; Resp'ts Suppl. Br. at 11.) But they cite no authority for the premise that the requirements of due process must be constrained by the executive branch's failure to enact enabling regulations. See Perez Bueno, 2026 WL 309934, at *3, 2026 U.S. Dist. LEXIS 24644, at *7 ("[T]he Due Process Clause of the Constitution may require greater procedural protections than a statutory or regulatory scheme provides when freedom from imprisonment is at stake.").

Accordingly, all three Mathews factors weigh in favor of providing Petitioner with a pre-deprivation hearing prior to any detention.

**5. Appropriate Remedy is Release, Not Post-Deprivation Hearing.**

Releasing Petitioner is narrowly tailored to the specific wrong, because it restores the status quo that was in effect before Respondents violated Petitioner's due process rights. Moreover, allowing the government to "cure" such a violation by providing a post-detention hearing would effectively render any holding that a pre-detention hearing is required meaningless; the government could always wait until a habeas petition is filed and then offer to hold a hearing.

Many courts have found that a post-detention bond hearing is insufficient in this context. See Gudavasov, 2026 U.S. Dist. LEXIS 49484, at *6, 2026 WL 712827, at *3 (collecting cases finding that release, rather than a post-detention bond hearing, is the appropriate remedy); Sachin v. Warden, No. 26-cv-00707-MWC-ADS, 2026 U.S. Dist. LEXIS 36819, at *9-11, 2026 WL 855741, at *3 (C.D. Cal. Feb. 21, 2026) (granting TRO ordering Petitioner's release, instead of a post-deprivation bond hearing, finding "Respondents … fail to recognize that a

bond hearing constitutes post-deprivation relief, which has no bearing on whether Respondents provided the requisite pre-deprivation relief.”).[11]

In fact, courts have most frequently found that this type of due process violation warrants *both* immediate release from custody *and* an injunction preventing further violations of Petitioner's due process rights. See, e.g., Medrano-Rocha v. Santacruz, 817 F. Supp. 3d 871, 882-83 (C.D. Cal. Jan. 23, 2026); Nieves v. Mullin, No. 5:26-cv-01471-DOC-DSR, 2026 WL 931143, at *4, 2026 U.S. Dist. LEXIS 77391, at *11 (C.D. Cal. Apr. 1, 2026); Fernandez v. Semaia, No. 25-cv-03412-SPG-MBK, 2026 WL 136229, at *7, 2026 U.S. Dist. LEXIS 10909, at *25 (C.D. Cal. Jan. 13, 2026).

Based on the weight of this persuasive authority, the Court will enter both types of relief here.

### C. Grounds 2, 3-B, 3-C, and 3-D Are Mooted by Release.

Because Petitioner will no longer be in custody as a result of the IJ's March 19, 2026 decision, grounds for relief based on alleged constitutional and statutory errors underlying that decision are moot.[12]

//

//

//

---

[11] Aguilar v. Semaia, No. 26-cv-00023-MCS-SSC, 2026 WL 166906 (C.D. Cal. Jan. 16, 2026)—a case in which the court found that a post-deprivation hearing was sufficient relief—is factually distinguishable because Aguilar “received significantly more process than in other cases in which courts have granted relief under Mathews,” including appointment of counsel in his immigration case (due to incompetency) and a recent, post-arrest hearing before an IJ. Id. at *5.

[12] Respondents argue that any claims challenging the IJ's finding of danger as an abuse of discretion are unexhausted. (Answer at 4.) The Petition does not raise such a claim. (Pet'r Suppl. Br. at 40.) This order, therefore, does not address the asserted defense of lack of administrative exhaustion.

## V. CONCLUSION

IT IS THEREFORE ORDERED that:

1. Grounds 1 and 3-A of the Petition are granted.
2. Grounds 2, 3-B, 3-C, and 3-D are dismissed without prejudice as moot.
3. Respondents shall **immediately release** [redacted] from custody.
4. If Respondents have not released Petitioner **within three (3) days** of the date of this order, Petitioner may file a request for an order to show cause re contempt.
5. Respondents shall not re-detain Petitioner without providing Petitioner a pre-detention hearing before a neutral decisionmaker where Respondents bear the burden of demonstrating by clear and convincing evidence that (a) Petitioner is a flight risk or a danger such that Petitioner's physical custody is required, or (b) on account of changed circumstances, there is a significant likelihood that Petitioner may be removed in the reasonably foreseeable future.[13]

DATED: October 8, 2026

Karen E. Scott

KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

[13] To the extent the Petition seeks attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), Petitioner's counsel would need to file a post-judgment motion that complies with 28 U.S.C. § 2412(d)(1)(B).